## ROYAL INSURANCE COMPANY *v.* MILLER.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF PORTO RICO.

No. 7.    Argued October 17, 18, 1905.—Decided November 27, 1905.

The owner of an estate in Porto Rico mortgaged the property to a bank,
the mortgage being granted by notarial act describing the property and
the fruits thereof and declaring that it was all planted in cane except
certain specified parts including the sugar manufactory and that the
loan secured was to enable the borrower to develop and keep the planta-
tion; as additional collateral the owner delivered to the bank a policy of
fire insurance on "stock of sugar and molasses deposited in the sugar
manufactory on the estate" which was not to take effect, however, until
several months thereafter; after the policy took effect and during its
life the sugar house and stock was burned; action was not brought until
more than fifteen but less than twenty years thereafter.   Meanwhile the
bank had become bankrupt and a special master appointed with power
to collect the assets thereof.   In an action by the special master on the
policy the company denied liability and the plaintiff's capacity to sue,
also pleading prescription.   The lower court permitted one of the parties
claiming an after-acquired interest in the policy antagonistic to the
plaintiff to be joined as party plaintiff.   A verdict was rendered for
both against the company.   In sustaining the verdict, *Held*, that:
Where the decree appointing a special master gave him express authority
to sue to collect all assets of the bankrupt, the fact that he was merely
designated as special master did not deprive him of the special powers
to sue conferred on him by the decree.
Under the law in force in Porto Rico the growing crop was, by operation of
law, included in the mortgage to the bank even though it had not ex-
pressly purported to embrace the fruits growing upon the mortgaged
premises.
The growing crop continued to be affected by the mortgage after its harvest
or manufacture into sugar up to the time of its removal or warehousing.
The rights of the mortgage creditor attached to indemnity for insurance
upon the mortgaged property, including the crops, provided the loss
occurred after the execution of the mortgage.
In countries governed by the civil law a mortgage is indivisible and where
junior incumbrances have not acquired rights necessitating a different
course a mortgagee may assert the entirety of his mortgage rights against
any or all of the property affected by the mortgage.
In the absence of express Spanish legislation affecting Porto Rico the law
prior to the extension of the Civil Code thereto in 1889 concerning limi-

tations of personal actions, is that generally prevailing under Spanish law and in this case the twenty-year term applied and not the fifteen-year term applicable under the Civil Code after its extension to Porto Rico.

Amendments are within the sound discretion of the trial court and not susceptible of review on error except for a clear abuse, and in this case there was no such abuse nor was there any impropriety in allowing the amendment joining the additional party plaintiff.

THE facts are stated in the opinion.

*Mr. Frederic D. McKenney*, with whom *Mr. Wayne Mac-Veagh, Mr. Francis H. Dexter* and *Mr. John Spalding Flannery* were on the brief, for plaintiff in error.

*Mr. Fritz V. Briesen* for defendants in error.

MR. JUSTICE WHITE delivered the opinion of the court.

Whether a judgment upon a verdict enforcing against the plaintiff in error a contract of fire insurance is erroneous, is the general question for decision. The record is confused, the pleadings involved and the errors assigned numerous. We shall, therefore, at the outset state the contracts with which the controversy is concerned, the pleadings and such uncontroverted facts as are essential to be borne in mind in order to comprehend the issues raised by the assignments of error.

On September 15, 1884, the Royal Insurance Company issued its fire policy in favor of Antonio Amadeo, "estate owner of Quebrada Arenas Maunabo," to the amount of sixteen hundred pounds sterling, "on stock of sugar and molasses deposited in the sugar manufactory on the estate Quebrada Arenas," the risk only to begin two months and four days thereafter, viz., on November 19, 1884, and embracing the period between that date and November 19, 1885.

On September 19, 1884, four days after the taking out of the policy, Antonio Amadeo, the insured, by a notarial act acknowledged that he had received a loan from the Caja de

Ahorros, a bank of Ponce, Porto Rico, amounting to $15,036.27, which he obligated himself to repay in two instalments, due in February and March, 1885. It was recited in the act that the money was lent to enable Amadeo "to attend to the developing and keeping of a sugar plantation by him owned." The act also described the plantation as the estate of Quebrada Arenas, gave the quantity of land, which it was declared was all planted in cane, except where used for pasturage and where covered by a sugar manufactory and other appurtenant buildings. A mortgage in favor of the lender was granted by the notarial act upon all the property described "and the fruits thereof."

On the sixth of February, 1885, the sugar manufactory on the estate of Quebrada Arenas was burned, and there was destroyed in the factory sugar and molasses alleged to be equal in value to the sum of the insurance. It was shown that some of the sugar and molasses was in hogsheads and some was in pans and other apparatus going through the process of manufacture.

Prior to the year 1901, in a court of the island of Porto Rico, the Caja de Ahorros was declared a bankrupt and trustees were appointed and took charge of its assets. In the year 1901 proceedings were begun in the United States District Court for Porto Rico by creditors of the bankrupt against the trustees, and Robert A. Miller was appointed a special master with power to collect the assets of the bankrupt estate. On April 23, 1902, Miller, as special master, commenced this action on the policy. The declaration averred the appointment of Miller and the authority given him to collect the assets of the Caja de Ahorros. The execution of the policy of insurance and mortgage of the plantation was then recited, and it was averred that the Caja de Ahorros as a mortgage creditor was entitled to the avails of the policy of insurance, and therefore had a right to enforce the same.

The declaration was demurred to, first, on the ground that Miller as special master was without authority to sue; and,

second, that the action was prescribed, no reference being made to the period of limitation relied upon. A general demurrer was also filed. The court overruled the special demurrers and sustained the general demurrer because of the want of precision in some of the averments of the declaration, which was afterwards remedied by amendment.

To the declaration as amended three pleas were filed, the general issue, a prescription of six years and a prescription of fifteen years. A demurrer was sustained to the plea of six years, joinder was had on the general issue, and a replication was filed setting up various acts, which it was alleged were interruptive of the alleged bar of fifteen-year limitation. Subsequently an additional plea was filed, averring in substance that on September 3, 1884, Antonio Amadeo by way of pledge had assigned the policy of insurance in question to a bank styled the Credito Mercantil, free from any claim of the Caja de Ahorros, the alleged mortgage creditor, and that by judicial proceedings the policy had been sold and purchased by said Credito Mercantil, and as neither the Caja de Ahorros nor Miller were the transferees of the Credito Mercantil, the plaintiff was not entitled to recover. A replication was filed denying all the averments of the plea, but admitting that Antonio Amadeo, on a date not named, had deposited the policy as collateral security with the Credito Mercantil, and that that corporation had, after the fire, bought in the policy at a judicial sale by it provoked, and had subsequently transferred the policy to one Lucas Amadeo. Upon this replication issue was joined by the defendant. Subsequently the court allowed Lucas Amadeo to become a party plaintiff and permitted amendments to the declaration to accomplish this result. These amendments averred the delivery of the policy as collateral security by Antonio Amadeo to the Credito Mercantil, the date not being given, the sale, long after the fire, of the policy under judicial proceedings, and its purchase by the Credito Mercantil, and the subsequent transfer thereof by the Credito Mercantil to Lucas Amadeo. It being besides

alleged that by the effect of this transfer Lucas Amadeo became a part owner of the policy "subject to the mortgage of the insured to Caja de Ahorros." No answer was filed to the amended complaint. An exception was, however, noted to the action of the court in permitting Lucas Amadeo to be joined as plaintiff.

The cause came on for trial. After the impanelling of a jury the court allowed the defendant to file six additional pleas, which were to be considered as traversed upon the record, and which were, in substance, as follows: 1st. That the plaintiff was not entitled to recover on the policy because Antonio Amadeo in obtaining the insurance had misdescribed the property or concealed material facts. 2d. That no recovery could be had in favor of the Caja de Ahorros or Miller, because no other person than Antonio Amadeo had any interest in the policy by operation of law, and no other person had any right in the policy by a conventional assignment from the insured, or, if there had been such an assignment, no notice thereof had been given the company, and its consent had not been indorsed on the policy, as required by its terms. 3d. Because Antonio Amadeo had materially increased the risk, without the knowledge and consent of the defendant, after the issue of the policy. 4th. That recovery could not be had, because the insured had not within fifteen days after the fire furnished adequate proof of loss, as required by the policy. 5th. That recovery could not be had, because petroleum and other inflammable oils had been stored upon the premises contrary to the terms of the policy. 6th. Because the claim made by the insured following the fire was false and fraudulent and the fire occurred by the incendiarism of the insured.

At the trial, evidence having been admitted tending to show the bringing by Miller, special master, of a suit in the District Court of the United States to foreclose the mortgage against the plantation executed by Amadeo, it was stipulated by both parties that no sale of the plantation to enforce the

mortgage thereon had yet been made. There was a verdict and judgment in favor of Miller, special master, and Lucas Amadeo, for the amount of the policy and interest.

Putting out of view for the present the question of the correctness of the action of the court in allowing Lucas Amadeo to be made a party plaintiff, it results that the issues arising on the trial were all embraced under the following headings:

1. Had the plaintiff capacity to sue, even if a cause of action in favor of the Caja de Ahorros was shown by the declaration? or

2. If Miller had the capacity to sue, did the Caja de Ahorros, as a result of the mortgage, acquire any right in or to the avails of the policy of insurance, and if so, did such right arise by operation of law without the existence of a transfer by the insured of his rights under the policy and the acceptance of such transfer by the company?

3. If the right to enforce the policy obtained by operation of law without assignment by the insured, could the Caja de Ahorros enforce the right by suing on the policy and without previously exhausting its remedies against the other property embraced by the mortgage?

4. Even if the Caja de Ahorros was vested with the rights of the insured and could exert such rights by suit on the policy without previously exhausting the other mortgaged property, had there been such misrepresentations by the insured in taking the policy or such failure after taking it to comply with its terms as precluded the right to recover?

5. In any event, was the action barred by the prescription of fifteen years?

And as the foregoing questions embrace every proposition covered by the errors assigned, except as to the right to join Lucas Amadeo as a party plaintiff, we come to consider the questions in the order stated, before passing on the error alleged to have arisen from an asserted improper joinder of parties.

First. The court found that the appointment of Miller as

special master gave him express authority to sue to collect all the assets of the Caja de Ahorros. As the record of the appointment of Miller, although introduced in evidence, does not form a part of the bill of exceptions, we must assume that the ruling of the court was correct, and this being assumed it obviously results that the court below rightly held that the mere designation as special master did not have the effect of depriving Miller of the substantial powers conferred upon him by the decree of the court appointing him.

Second. The proposition that the Caja de Ahorros acquired no right to the policy of insurance in virtue of the mortgage involves two contentions, which require distinct consideration; the one, the proper construction of the policy and the other the operation of the law of Porto Rico upon the policy when properly construed. The first rests upon the assertion that the sugar and molasses covered by the policy was a distinct lot of sugar and molasses, warehoused on the plantation at the time of the issue of the policy, and therefore had no legal relation to a subsequent mortgage of the plantation itself; and the second, that in any event sugar and molasses in the manufactory on the plantation was movable property, not susceptible of being mortgaged under the law of Porto Rico.

The policy covered a "stock of sugar and molasses deposited in the sugar manufactory on the estate 'of Quebrada Arenas.'" It is true that the word deposited when standing alone might well be considered as referring to exclusively sugar and molasses then existing, and in the sugar house. But the correctness of this construction is negatived by the fact that the risk under the policy was not to attach at the date of the policy, but in two months and four days thereafter. When this period of the commencement of the risk is considered in connection with the place at which the property insured was situated, viz., a sugar manufactory upon a sugar plantation, on which there was a growing crop, we think the policy must be held to have covered sugar to come into the sugar house on the plantation as the result of the future operation of the factory. And

this conclusion is fortified by the indefinite description given of the property insured, which was not of a given number of commercial packages of sugar and molasses, held in a warehouse, but merely a stock of sugar and molasses, a description embracing such stock in whatever form existing, and which might be in the factory at the time the risk attached.

Additional force to the construction we give the policy likewise results from the course of the trial below, since it appears that no objection was noted to the introduction of testimony showing that the property destroyed, for which a claim under the policy had been made by the insured, consisted of sugar and molasses which was in the sugar house as the result of the process of manufacture of the growing crop therein carried on, and moreover no instruction was asked upon the hypothesis that if the property destroyed was of that character it was for that reason alone not covered by the insurance or embraced in the mortgage.

The policy then embracing a stock of sugar and molasses to come into the sugar house on the plantation as the result of the manufacture of the crop which was growing thereon at the time the policy was issued, the question then is, Did the mortgage creditor, in virtue of the mortgage, acquire a right to the avails of the policy?

Undoubtedly, as a general rule under the Spanish law in force in Porto Rico at the time of the giving of the mortgage, only real property was the subject of mortgage. (Mortgage Law of 1880, Art. 114; Mortgage Law of 1893, Art. 110, War Department translation.) But by that law a mortgage extended to the "natural increase, improvements, growing crops and rents not collected when the obligation falls due, and the value of indemnities allowed or due the owner for insurance on the property mortgaged or by virtue of condemnation by right of eminent domain." (Mortgage Law of 1880, Art. 118; Mortgage Law of 1893, Art. 110.) And the Mortgage Law of 1880 as well as the Mortgage Law of 1893, moreover provided as follows:

"In accordance with the provisions of the preceding article, the following shall be considered mortgaged together with the estate, provided they belong to the owner of the estate, although they are not mentioned in the contract:

\*     \*     \*     \*     \*     \*     \*     \*

"3. Crops, which at the time the obligation falls due, are growing on the trees and plants, or have already been harvested, but not yet removed or warehoused.

\*     \*     \*     \*     \*     \*     \*     \*

"5. Indemnities awarded or due the owner of the mortgaged realty, either for the insurance thereof or for the crops, provided the damage occurred after the creation of the mortgage, or on account of condemnation of the land by the right of eminent domain." (Mortgage Law of 1880, Art. 119; Mortgage Law of 1893, Art. 111.)

To grasp the import of the provisions just quoted a general understanding of the system of mortgages prevailing in the countries governed by the civil law is necessary. By that law the title to mortgaged property remains in the mortgagor and the effect of the mortgage is not, therefore, to deprive the mortgage debtor of his right to administer the property before the obligation falls due. In other words, whilst the mortgage dismembers the ownership by depriving the owner of the right of *abusus*, and therefore divests him of the perfect ownership, it leaves him the imperfect ownership, with the full *usus* and *fructus* of the property mortgaged. Generally, in such countries, and by operation of law, growing crops are included in a mortgage, yet as such crops are naturally thereafter to become movable by their harvesting as an incident of administration and of the *usus* and *fructus*, the right of the owner to realize by gathering the crops and disposing of the same before the mortgage becomes due exists, such gathering and realizing being considered as a mobilization of the crop, therefore taking it beyond the scope of the mortgage. See Code Nap. Art. 2118; P. Pont, Privileges et Hypotheques, vol. 1, p. 353, secs. 360, 362. Indeed, under the Napoleon

Code this power of the debtor to administer the mortgaged property by an act of administration, done without fraud and in good faith, is, by a writer on that code, asserted to be so complete that his right to produce the mobilization of a crop is deemed to arise by a mere sale of the crop as growing without any actual concurrent severance of the crop from the realty. (*Ibid.* Sec. 363.)

It will be observed that, although, generally speaking, the Spanish law, in force in Porto Rico conforms to the theories just stated, it restricts the right of administration and power to mobilize a growing crop to narrower limits than is the case under the Code Napoleon. Thus, by the terms of paragraph 3 of the Code for Porto Rico, the power of the mortgage debtor to administer is controlled by a provision causing crops which are harvested at the time the mortgage falls due to remain subject to the mortgage, despite the harvesting, provided they have not yet been "removed or warehoused." And it will also be observed that paragraph 5 of the same code, as to indemnities arising from insurance on crops, further restricts the power of administration vested in the mortgagor by declaring that, as to indemnities arising from insurance on the crops, the right of the mortgage creditor attaches, even although at the time of the loss the mortgage debt had not become due, provided the damage occurred "after the creation of the mortgage." This meaning, plainly resulting from the terms of paragraph 5, is also sustained, as we shall have occasion hereafter to show, by the act governing in Porto Rico concerning the procedure for the enforcement of mortgages, wherein the right is conferred upon the mortgage creditor to impound the avails of insurance upon crops destroyed by fire before the coming due of the obligation, but not collected before such maturity. In other words, the right of the mortgage debtor under the power of administration and by virtue of paragraph 3, to mobilize the crop and thus remove it from the operation of the mortgage, ceases to exist, by the very terms of paragraph 5, upon the destruction by fire of the mortgaged

crop, the law treating such destruction as irrevocably fixing the character of the crop as immovable, and causing the indemnity as its representative to be no longer subject to mobilization.

The crop here in question was one of growing cane, whose harvesting depended upon the treatment of the cane at the sugar factory. It is not questioned by either party to the record, and indeed we think it clearly results from the mortgage law to which we have referred, that the crop which is therein subjected to the mortgage is not simply a growing product, but the harvested crop, which in the case of growing sugar cane necessarily includes the result of treating the cane at the sugar house—that is, a crop of sugar and molasses.

From the text of the law we have quoted and the exposition just given of its general import, the following conclusions result:

First. That the growing crop was, by operation of law, included in the mortgage to the Caja de Ahorros, even although the mortgage had not, as it did, expressly purported to embrace the fruits growing upon the mortgaged property.

Second. That the growing crop of cane continued to be affected by the mortgage after its harvest or manufacture into sugar up to the time of its removal or warehousing.

Third. That the rights of the mortgage creditor attached to indemnity for insurance upon the mortgaged property, including the crops, provided the loss occurred after the execution of the mortgage.

Under the construction which we have given the policy of insurance, these propositions are decisive in favor of the right of the mortgage creditor, unless it be that the sugar and molasses in question, although it had come from the growing cane and was at the time of the fire in the sugar house as the result of the manufacture from such cane, or was in the process of manufacture, was yet not subject to the rights of the mortgage creditor, because it is to be considered as having been then "warehoused" within the meaning of that word as employed

in paragraph 3 of Article 119 of the law of 1880, which we have quoted. But to so hold would be at one and the same time to admit and to deny the rights of the mortgage creditor to the avails of the crop and to the indemnity arising from the insurance. This must follow, because it is impossible to conceive of the harvesting of growing sugar cane without at the same time presupposing the existence in the sugar house of sugar and molasses as the result of the harvesting. We construe the warehousing referred to in the provision of the mortgage law in connection with the word "removed," with which it is associated. In other words, we construe it as relating to a distinct act of warehousing, separate from the mere existence of the manufactured product in the sugar house wherein it was made.

As, then, the mortgage by operation of law embraced the crop, and as also by operation of law the mortgage creditor was entitled to the benefits of the indemnity resulting from the insurance, it follows that the right of the mortgage creditor did not depend upon an assignment of the policy, and the contentions upon that subject are without merit.

The doctrine common to countries governed by the civil law is that a mortgage is indivisible. Code Napoleon, Art. 2114; Paul Pont, Privileges et Hypotheques, vol. 1, p. 319, par. 330 *et seq.* And we think it is not to be doubted that the law of Spain, in this respect, was not different. Schmidt, Civil Law of Spain and Mexico, p. 180, Art. 853. The mortgage being indivisible, the mortgage creditor had an undoubted right to assert the entirety of his mortgage rights against any or all of the property affected by the mortgage.

The contention pressed at bar, that the mortgage creditor had no cause of action to recover the insurance money subject to his mortgage because the law gave the power to proceed to enforce the mortgage by what is known in the Spanish law as *via executiva*, we think is without merit. The existence of the summary remedy does not tend to the implication that the creditor might not, if he elected so to do, proceed

*via ordinaria* to obtain judicially a decree recognizing his right of mortgage on the insurance money and enforcing payment of the amount.

This is illustrated by a provision (Art. 161) in the general regulations, put in force in 1893 for the execution of the mortgage law, wherein it is provided that where an indemnity for insurance on property covered by a mortgage becomes due in consequence of the destruction of the property by fire, before the maturity of the mortgage debt, the creditor has a right to compel the deposit of the sum of the insurance to await the period of the maturity of the mortgage obligation. Manifestly if the mortgage creditor be endowed with this right before his mortgage debt becomes due, the right of such creditor to proceed separately to recover the insurance money after his debt becomes due must obtain. This case does not require us to pass upon, and we therefore do not decide whether, under the Spanish law, if there was a junior incumbrancer having some special right in or to the avails of the insurance money, such junior incumbrancer would be entitled to compel the mortgage creditor to exhaust the other property covered by the mortgage before attempting to irrevocably impute or apply the proceeds of the insurance to the *pro tanto* extinction of the mortgage debt.

Fourth. All the questions concerning alleged misrepresentation in obtaining the policy, of misdescription of the property, of a material increase of the risk of incendiarism, and of the failure to make the due proofs of loss required by the policy, depend for their ultimate determination upon questions of fact, which were concluded adversely to the plaintiff in error by the verdict of the jury. Although they are referred to, as they are not pressed in the brief of the plaintiff in error, we content ourselves with saying that we think the court, as to the matters in question, correctly applied the law to the state of the proof.

Fifth. The fire occurred on February 6, 1885. Suit was brought on April 23, 1902, and Lucas Amadeo was made a

party plaintiff on May 13, 1903. In other words, even although the cause of action on the policy only arose within a reasonable time after the making of proofs of loss, more than fifteen years elapsed between the arising of the cause of action and the bringing of this suit. Both parties at bar admit that the action on the policy was personal in its nature, and barred by the term of prescription governing actions of that character.

As we have seen, the defendant (plaintiff in error here) specially pleaded and relied upon the prescription of fifteen years. The applicability of that prescription is based upon article 1964 of the civil code, which provides: "A mortgage action prescribes after twenty years, and those which are personal and for which no special plan of prescription is fixed, after fifteen years."

As both parties concede that there was no special term of prescription fixed by the civil code for an action upon an insurance policy, it follows that the right to sue on the policy was barred by the limitation in question, if that limitation applied. The defendants in error—the plaintiffs below—deny its applicability, and insist that the term of prescription was twenty years, and, moreover, insist that, even if the fifteen-year term applied, the action was not barred, because of interruptions of the prescription asserted to result from the proof as to alleged demands and acknowledgments. The trial judge, whilst rejecting the claim of the plaintiffs as to the twenty-year prescription, and maintaining that of the defendant as to the fifteen-year prescription, yet held the action not barred, because of the interruptive effect which the court considered arose from certain demands or acknowledgments, which it was deemed were established by the proof. Before coming to consider the alleged errors on this subject we must determine whether the time of prescription was fifteen years, as asserted by the defendant and held by the trial court, or twenty years as contended by the plaintiffs.

The loss under the policy occurred in 1885, and the right of action arose, therefore, in that year. The civil code was

not then applicable to Porto Rico, not having been extended to that island by Royal Decree until 1889, and the claim that the twenty-year prescription is the only controlling period is based upon that fact. Whilst it is conceded that by the terms of the civil code personal actions were barred by fifteen years, the argument is that by the code actions which arose prior to its promulgation were to be controlled by the prior law, which, it is insisted, was twenty years. The provision of the code relied upon to maintain this proposition is article 1939, which reads as follows:

"Article 1939. Prescription, which began to run before the publication of this code, shall be governed by the prior laws; but if, after this code became operative, all the time required in the same for prescription has elapsed, it shall be effectual, even if, according to said prior laws, a longer period of time may be required."

As the fifteen years fixed by the code for the bringing of personal actions had not elapsed between the promulgation of the code and the bringing of this action, it follows that the controversy was not within the terms of the proviso, and therefore the limitation of the cause of action is to be determined, not by the code provision fixing fifteen years, but by the prior law. What was the term of prescription of personal actions under the prior law is, therefore, the question.

In the absence of express legislation concerning Porto Rico, what was the prior law applicable to that island concerning the limitations of personal actions, must be fixed by ascertaining the period of prescription for personal actions generally prevailing under the Spanish law. Schmidt, Civil Law of Spain and Mexico, p. 35. Whilst the general Spanish law, prior to the promulgation of the civil code, is to be derived from a review of the successive Spanish codes, nevertheless the Spanish law prevailing prior to the code is primarily to be found in the code known as the Novisima Recopilacion.

By Law 5, Title VIII, Book 11, of the Novisima Recopilation, it appears that the term of prescription of personal ac-

tions was twenty years. White, New Recopilacion, vol. 1, p. 96. And from an edition of the Spanish Codes, with concordance and notes, published at Madrid in 1850, under the text of the Novisima Recopilacion in question (vol. 9, p. 458), it appears that the limitation of twenty years as to personal actions, as expressed in the text of the Recopilacion, prevailed as early as 1348, in the code known as the Ordenamiento de Alcalá.

Moreover, the Supreme Court of Spain has held, in repeated decisions, that the provision found in the Novisima Recopilacion, above alluded to, was the general law of Spain on the subject, in force prior to the adoption of the civil code, and that by that law the limitation of personal actions was twenty years. References to a Spanish publication, in which many such decisions are reported, are given in the margin.[1]

It follows that the court below erred in applying the fifteen-year period of prescription, and that as twenty years had not elapsed from the time the cause of action arose to the bringing of the suit on the policy, the right to sue was not barred by limitation.

But it is insisted that, as the trial judge erred, either in admitting evidence or in the legal effect which he gave to the evidence admitted, concerning acts which were held adequate to interrupt the course of the fifteen-year prescription, there should be a reversal, despite the fact that it is now decided that a longer period of prescription controlled, concerning which the acts of interruption were wholly irrelevant, and

---

[1] Decisions of the Supreme Court of Spain, sitting at Madrid, reported in the Jurisprudencia Civil, holding the period of prescription of twenty years applicable to personal actions: Sentence of January 21, 1863, vol. 8, p. 54, No. 20; Sentence of March 17, 1865, vol. 11, p. 326, No. 92; Sentence of April 8, 1865, vol. 11, p. 469, No. 139; Sentence of June 4, 1886, vol. 60, p. 24, No. 7a; and Sentence of October 3, 1892, vol. 72, p. 142, No. 40 of the last mentioned Sentence. See also Sentence of March 24, 1892, vol. 71, p. 307 (after the enactment of the code); Sentence of March 9, 1865, vol. 14, p. 264, No. 75; Sentence of May 12, 1874, vol. 30, p. 56, No. 181; Sentence of April 1, 1884, vol. 54, p. 548, No. 137; Sentence of March 12, 1888, vol. 61, p. 404, No. 89; and Sentence of April 19, 1901, vol. 91, p. 556, No. 105.

therefore not in any way prejudicial. We cannot yield our assent to the proposition. The contention that there should be a reversal because the defendant might have introduced evidence at the trial in support of certain defenses set up in its answer other than prescription, if it had not relied upon the certainty of securing a reversal by this court of any judgment which might be obtained against it, because of what was deemed to be the erroneous rulings as to the interruption of the prescription, is without merit. What term of prescription was applicable to the action was a disputed question at the trial; and we cannot admit that the defendant, by neglecting to make full defense and by speculating on the chances of a verdict in its favor, could secure the right to a reversal of a verdict and judgment against it because of an error of law which in a legal sense occasioned no possible prejudice. And equally without merit is the contention that there would be prejudice if there be not a reversal, because in this court, relying upon the sufficiency of the errors assigned relating to the action of the court concerning the proof of interruption of the fifteen-year prescription, there was a neglect to assign other substantial errors, which it is asserted the trial court committed as to the admissibility of certain evidence and the striking out of various answers of a witness who had given testimony under a commission. As we are at liberty, however, despite the absence of an assignment of error on the subject, to consider a plain error arising on the record, we have given our attention to the subjects referred to, and content ourselves with saying that we think they are devoid of merit.

It remains only to consider the error alleged to have been committed by the trial court in allowing Lucas Amadeo to be made a party plaintiff.

The elementary rule is that amendments are within the sound discretion of the trial court, and are not susceptible of review on error, except for a clear abuse. *Gormley* v. *Bunyan*, 138 U. S. 623.

The objection made at the trial to the amendment was that

it substituted a new party and an entirely new cause of action. That there was no clear abuse in this case we think results from article 156 of the Law of Civil Procedure for Cuba and Porto Rico, War Department Translation of 1899, providing as follows:

"Causes of action against several persons, or by several persons against one, arising from the same source of title or based upon the same cause of action, may be joined and brought in one action."

The claims of both parties depended upon the contract of insurance. There was no inherent antagonism between the two claims, since the amendment making Lucas Amadeo a party expressly alleged that his rights in and to the policy were subordinate to those of Miller, special master. We consider the provision of the code of procedure above quoted as analogous to the provision in the codes of a number of the States of the Union, by which an action is required to be brought in the name of the real parties in interest, and it is allowable to join as parties plaintiff those having an interest in the recovery sought. *Fireman's Ins. Co.* v. *Oregon Railroad Co.*, 45 Oregon, 53; *Fairbanks* v. *San Francisco & North Pacific Ry. Co.*, 115 California 579; *Home Ins. Co.* v. *Gilman*, 112 Indiana 7; *Winne* v. *Niagara Fire Ins. Co.*, 91 N. Y. 185, 192; *Pratt* v. *Radford*, 52 Wisconsin 114.

The contention in the argument that the permitting of Lucas Amadeo to be joined as plaintiff was in legal effect a consolidation of pending causes, which could not be made after answer filed, relying on article 157 of the code of civil procedure, was not made below, since the ground of objection made at the trial was that the amendment substituted a new party and an entirely new cause of action, not that it was merely too late to permit the amendment.

But it is further contended that as the bill of exception states, that no evidence was offered proving or tending to prove any transfer, by the Credito Mercantil of the policy sued on to Lucas Amadeo, therefore there was no proof whatever

tending to establish title in Lucas Amadeo to the policy, and hence there must be a reversal. On the state of the record, however, this objection is not available. The amended declaration making Amadeo a party, and alleging a transfer to him by the Credito Mercantil, was not traversed. It is argued, however, that no express traverse was necessary, because the plea of the general issue filed to the declaration before the allowance of the amendment must be applied to the amendment, and, therefore, the amended declaration should be regarded as having been traversed. Conceding, for the sake of the argument, the rule ordinarily to be as stated, and further conceding that that rule obtained under the procedure in Porto Rico, we do not think that it is here applicable. We say this because the record establishes that the case was tried upon the hypothesis that the transfer to Amadeo by the Credito Mercantil was not disputed, but on the contrary was an admitted fact in the case. Thus, when the court came to charge the jury, it enumerated specifically various issues of fact which they were to determine, and among those issues was not embraced any controversy whatever upon the fact of the transfer by the Credito Mercantil to Lucas Amadeo, as alleged in the amendment to the declaration, and no exception was taken to the action of the court in this particular. Moreover, although various instructions were asked to be given to the jury, on behalf of the defendant, no request was made which in any way intimated that the defendant disputed the fact that Lucas Amadeo had acquired the interest, if any, of the Credito Mercantil in the policy in question, as alleged in the amended declaration. Indeed, we think the record affirmatively establishes that the case was tried below upon the assumption by all the parties that if there was a right to recover on the part of Miller, special master, and Lucas Amadeo had properly been joined as a party plaintiff, a joint recovery was not improper.

*Judgment affirmed.*