JUAN BERTRAN Y CASAÑAS ET AL., Complainants,

*v.*

MULLENHOFF & KORBER ET AL., Respts.

---

San Juan, Equity, No. 315.

1. The principles regarding the marshaling of securities and assets are in force in Porto Rico.

2. The owners of second mortgages, who take the verbal promise of their debtor that their mortgages will be discharged by the owners of the first mortgage after foreclosure and sale, but who have no such promise from the latter, cannot thereafter claim from the first mortgagees.

3. And this is so even if the first mortgagees secretly agreed with the mortgagor afterward to pay him a sum of money and deed him back part of the land, unless it can be shown that the first mortgagees had prior knowledge of the promise of the mortgagor to the second mortgagees.

Opinion filed February 21, 1908.

---

*Mr. Francis H. Dexter,* solicitor for the complainants.

*Mr. Henry F. Hord,* for the respondents.

RODEY, Judge, delivered the following opinion:

This is a bill in equity by which it is sought to make the

### Bertran y Casañas v. Mullenhoff & Korber.

respondents Mullenhoff & Korber responsible for about the sum of $13,000 because of their action in and about the foreclosure of certain mortgages on property belonging to respondents Argueso and wife.

The complainant Juan Bertran, as it is said, is a man of substance, engaged in merchandizing and in the sugar plantation business at and near Humacao, on the eastern end of the island of Porto Rico. He was the active man among the complainants in the transactions now about to be discussed. The respondents Manuel Argueso and Ernestina Frias, his wife, formerly lived at that same place, but, shortly after the committing of the grievances here discussed, left for the United States, and have ever since remained away, and were brought into these proceedings by substitute service. Previous to the occurrences complained of, they no doubt possessed considerable means, although their affairs in later years were heavily involved. The husband had a power of attorney from his wife, and therefore he alone, for both of them, transacted all the business leading up to and including the object of the complaint.

The other respondents, Mullenhoff & Korber, are a firm of general merchants and bankers here at San Juan, of many years standing, and are said to be men of very considerable substance. Previous to the occurrences terminating in the alleged grievances complained of, Argueso and wife were the owners of a dozen to fifteen sugar plantations at and near Humacao, besides other property, and one of their plantations, known as "Ingenio," had a large sugar manufacturing plant with all necessary buildings and other appurtenances located upon it. This Ingenio plantation is situated in the barrio of Aguacate and municipality of Yabucoa. The bill alleges that it contains about 971 cuerdas of land, while some of the other papers

in the case claim that it contains some 1600 cuerdas and includes seven or eight different pieces of land with the 971 cuerdas mentioned. However, as will be seen, this discrepancy is immaterial at this time.

It appears that for several years previous to the 10th of May, A. D. 1902, Argueso and wife had a mortgage amounting to something like $80,000 outstanding against this Ingenio plant and plantation and other property, and that the firm of Fritze, Lundt, & Company, of San Juan, who were also large merchants and bankers, were the owners of it, but that, at the date mentioned, it had been paid off save a small balance of $5,100. About this time the respondents Mullenhoff & Korber, to whom Argueso had evidently also been indebted in a large amount for several years, probably at his request, paid off this balance of $5,100 to Fritze, Lundt, & Company, and took an assignment of that firm's mortgage to themselves. They then evidently compromised and novated their debt and took a new mortgage (which, of course, was then virtually a first lien) from Argueso and wife for their entire debt to that date, which, when compromised and reduced from pesos to dollars, made a net agreed amount of $60,000, and to this was added $13,000 of new debt and $10,000 of accrued interest, making in all $83,000 for which the mortgage became a lien. It was further attempted in this new mortgage to keep their previous mortgage in effect on all the properties mentioned in the same. This new mortgage specifically covered this main plantation, Ingenio, and the said numerous other properties belonging to Argueso and wife, the amount that each property was to be responsible for being set out in detail, but it is uncertain just how much Ingenio was to be responsible for, owing to the dispute as to what particular lands composed that plantation.

They also took a mortgage for $20,000 additional, secured by the growing crops of cane on several of the plantations; but this latter mortgage cuts little or no figure in this case, as it was the foreclosure of the $60,000 mortgage and the $5,100 balance of mortgage which is claimed to have injured complainants.

It further appears that a little more than a year after this time, and on July 15, 1903, Argueso and wife, also being indebted to the complainants and their predecessors in interest in the sum of a little more than $40,000, made arrangements to pay the same proportionately to the several owners in instalments, and gave them a second mortgage, junior to that of Mullenhoff & Korber, on this same plantation, Ingenio, but not on the other properties, to secure it. That, at the time of the giving of this $60,000 mortgage to Mullenhoff & Korber, the respondents Argueso and wife probably had some prior liens outstanding on some of their other properties; but, shortly thereafter, they gave second mortgages to others of their creditors upon all of said other outside properties, not including Ingenio. That all of the mortgages herein mentioned were promptly placed of record in the proper registry districts where the several plantations were situated, and the protocols thereof, in the offices of the notaries, were duly transmitted to the supreme court, as required by law. That thereafter several instalments of the money thus secured to these complainants by their said second mortgage on Ingenio were paid to them by Argueso and wife, so that, at the time of the occurring of the matters complained of in the bill, and at the time of the filing of the same, there remained due complainants only the sum of $12,368.17, to which was to be added interest from the maturity of the defaulted instalments. That, some time after the taking of the second mortgage on Ingenio by these complainants, the

respondents Mullenhoff & Korber, after having had some diffi-
culty about the collection of their claims, from and because of
their treatment by Argueso and wife, and, of course, after their
mortgages were overdue, began proceedings in the proper in-
sular court to foreclose their said mortgage for $83,000 with
interest and costs, and the one they had purchased from Fritze,
Lundt, & Company, also with interest and costs, so that the
whole amounted to the sum of $88,000.

It is in evidence that, as soon as the respondents Mullenhoff
& Korber thus attempted to foreclose their prior mortgages,
the respondent Argueso at once interposed many dilatory plead-
ings to the same, and instituted several affirmative proceedings
directly against Mullenhoff & Korber to prevent the foreclosure,
in many of which proceedings he was vigorously joined by the
complainants, particularly the said Bertran, and others of his
creditors. In some of these proceedings Argueso sought by a
technicality to defeat Mullenhoff & Korber absolutely in the
collection of any of the debt he owed them, on the ground that
they had omitted to record their partnership agreement under
some local law, and that therefore they had no partnership
identity or standing at all in court. The battle between the
parties in this behalf became extremely bitter and at one time
there were as many as fifteen or more different proceedings pend-
ing between them, and so hostile did they become to each other
that Mr. Korber, of the respondent firm of Mullenhoff & Korber,
was at one time lodged in jail under some criminal charge for
some alleged wrong doing connected with the matter.

On the 6th of July, 1904, when this bitter contest was at its
height, Argueso, ostensibly in an effort to settle his troubles,
approached Mullenhoff & Korber and entered into an elaborate
written contract with them before a notary, but it does not ap-

Bertran y Casañas v. Mullenhoff & Korber.

pear that this agreement was ever made public, whereby Mullen-hoff & Korber agreed to dismiss all of the many proceedings they had against him and his wife, save the plain suits to fore-close their said two mortgages, and he, on his part, for himself and his wife, agreed to dismiss the several suits, mandamuses, summary actions, pleas, charges, offsets, and other proceedings he had against them in his own name and also to secure the dis-missal of many other proceedings, actions, attachments, man-damuses, etc., against them and the mortgaged property, that were in the names of these complainants and all others, and, in addition, agreed, and in some way did, it seems, settle his $20,000 crop mortgage with them by giving them a lot of sugar he had on hand, etc., although there is evidence that he defraud-ed them out of this payment, and in other ways, by removing a great deal of the sugar and other movable property of the plantation Ingenio that they were to get under their agreement. This agreement further contained an absolute acknowledgment and confession on the part of Argueso and wife that they were duly indebted to Mullenhoff & Korber in the full amount ($88,000) claimed in their aforesaid foreclosure suits, and further provided that Mullenhoff & Korber were to be at once let into the sole and exclusive possession of the Ingenio planta-tion and the sugar factory and all its lands and appurtenances to the full extent of the 1600 cuerdas. It provided further that Mullenhoff & Korber should prosecute the litigation re-ferring to their said mortgages until they obtained a judicial adjudication of all the lands and property in the same men-tioned, in payment of their debts, from the court, and that, after they had thus obtained clear title to all of the property, they were to presumably cancel their entire debt in the premises, and deed back to Argueso and wife, or to any person whom

III. PORTO RICO—25.

Bertran y Casañas v. Mullenhoff & Korber.

Argueso should designate, all of the properties and interests in properties which they thus obtained by judicial sale or adjudication, except the main plantation Ingenio, with its sugar factory; and that, in addition, as soon as Argueso should procure the dismissal of all of said proceedings against them, and deliver the proper documents to that effect to Mullenhoff & Korber, the latter would pay him in cash the sum of $13,250. This agreement also provided that a document entered into some ten months previously, on the 16th of September, 1903, between Argueso and wife and these complainants, should be kept by Mullenhoff & Korber until all of the documents conferring complete title to the Ingenio plantation, the sugar factory, and the other properties, on Mullenhoff & Korber, should have been procured and recorded. The document referred to is a curiously-worded instrument between the complainants and Argueso. It sets out (to use its own peculiar language) that after the execution of the second mortgage to complainants, as first herein set out, by Argueso and wife, a certain favorable evolution has arisen in Argueso's business, where certain respectable parties are willing to acquire the estate Ingenio pending the result of the suits instituted by Mullenhoff & Korber, and that the complainants Bertran and others, in order not to hamper or impede Argueso's efforts to settle his affairs, bound themselves in the most solemn manner to assign to anyone Argueso should designate, the total amount of the balance due on their said mortgage indebtedness, and that Argueso would then at once procure such assignee or grantee to execute to them a proper lien on the same fund for their security and for any other advances they might make him.

It is in evidence that there were four or five copies of this peculiar document executed, and it is further in evidence that,

on one of them, under date of June 25, 1904, complainants added a footnote, which all the parties signed, providing that, "on this date it is set forth that, instead of the cession stipulated in the first covenant of this counter document, and in order to facilitate Mr. Argueso and his wife in the full settlement of their judicial difficulties with the firm of Mullenhoff & Korber, of San Juan, we have delivered to the said Mr. Argueso a letter bearing our signature, authorizing out attorney, José de Guzman Benitez, under certain conditions, to dismiss, in our behalf, the judicial actions and proceedings which we have filed against the said firm of Mullenhoff & Korber." It appears that Argueso showed a copy of this document to Mullenhoff & Korber or their attorney, which did not contain the footnote referred to. Both copies are in evidence. A translation of the letter referred to, which the complainants sent by Argueso to their attorney, Mr. José de Guzman Benitez, was as follows:

Humacao, June 25, 1904.

To Lawyer José de Guzman Benitez,

San Juan.

Very distinguished sir and friend:—

Messrs. Mullenhoff & Korber are engaged in friendly negotiations with Manuel Argueso, with a view to getting all their matters settled, and, as it is necessary that you should not continue the proceedings and suits which you have in our name against that firm, we ask you that, after receiving this, you shall desist from claiming the nullity of their demand for their failure to have legal personality as a firm, and also to dismiss all other proceedings that we have against them. But we desire it understood that we do not renounce our mortgage rights that we have in the plantation, which, as we have explained to

Argueso, we cannot at this time afford to abandon. We will dismiss all proceedings we have against Mullenhoff & Korber up to date, in so far as it relates to the plantation Ingenio, but, at the same time, we desire a guaranty from those gentlemen that they will hold us harmless against any claims which they might bring against us on account of these matters; and, as to your own fees, you must see Argueso, as we have agreed with him. We thank you sincerely for the earnest co-operation with such good result that you have so far given us, and, with the highest respect, we are,

Yours truly, etc.,

(Signed by Juan Bertran and the

other complainants.)

Eleven days later, on July 6, 1904, this attorney, José de Guzman Benitez, who was the attorney of record for Argueso and the complainants and others in this large number of hotly-contested proceedings against Mullenhoff & Korber, as above mentioned, went into the district court at San Juan, where the proceedings were pending, and filed a dismissal of every one of them, over his own signature, his right to do so being sworn to before a notary. The court thereupon entered a judgment of dismissal in all the cases, and thus left all of the properties free for Mullenhoff & Korber to proceed against in their own fore-closure suit, under their two mortgages above referred to. It seems, though, that this attorney did nothing (at least, there is no evidence of it) to notify Mullenhoff & Korber or their attor-ney of the letter he had received as aforesaid from his own clients (the complainants), and took no steps to, in any manner, caution Mullenhoff & Korber to protect his clients, or against paying this $13,250 direct to Argueso, if he knew of the agree-

Bertran y Casañas v. Mullenhoff & Korber.

ment to pay it, which is doubtful, but left Mullenhoff & Korber and their attorney to believe that Bertran and the other complainants and all the other several mortgagees had probably, in some manner, arranged their matters satisfactorily with Argueso and wife. Thereupon, on the following day, Mullenhoff & Korber paid in cash to Argueso, in person, through their attorney, and received his receipt therefor, the sum of $12,903.05, the evidence showing that the difference between that sum and the sum of $13,250, which they had agreed to pay him, was made up in some manner by the taxes due on the properties to be foreclosed upon. The original canceled checks and original receipt under the proper dates are in evidence showing this payment, and Mr. Korber personally testified to the actual payment in cash.

Mullenhoff & Korber, through their attorneys, then proceeded with their foreclosure suits in the proper district court, and, after obtaining a decree of foreclosure, or the adjudication to them under the local law, whichever it was, and after due advertisement thereof, twice made, had all of the same sold by the marshal of the court at public sale, and bid the same in themselves, paying the sum of $71,021 (out of their debt, of course) for the entire properties mentioned in their said mortgages, and thereafter the marshal, in due course, on December 9, 1904, made them a deed for all of the same, and, in accordance with their said written agreement of July 6, 1904, to Argueso, they shortly thereafter made a deed at his request to his brother-in-law, one Fulladosa, for all of the properties other than Ingenio that they had thus bid in at the sale. This foreclosure, of course, shut out every second mortgagee, including complainants, on all of the properties mentioned, and all of

Bertran y Casañas v. Mullenhoff & Korber.

such junior liens were thereafter, by order of court, duly canceled of record.

It appears that this secret agreement, as it was called during the trial, although it was made before a notary, between Mullenhoff & Korber and Argueso, was not known to any of the second-mortgage holders, although the attorney for the respondents Mullenhoff & Korber insists—but upon what evidence we do not know—that Bertran and the other complainants had full knowledge of it. So, as soon as the other creditors and second mortgagees learned of Mullenhoff & Korber making this deed to Argueso's brother-in-law for all of these extra properties, they investigated, and several of them at once attached the same in the hands of Fulladosa, and, after due proceedings in that behalf in this court, executed upon the same in satisfaction of their several claims. There is a balance from such source, after satisfying these claims, now in the registry of this court, amounting to $1,856.50, which these complainants, by a motion in that behalf, on file, ask shall be applied to the payment of their claim in this suit.

These complainants assert that the first knowledge they had of this so-called secret agreement between Mullenhoff & Korber and Argueso was when these attachment proceedings were brought against Fulladosa by other creditors, where that fact was brought to light; and intimate that this is the reason they did not protect themselves at the time of the public sale. That, when they saw the property bid in for nearly $20,000 less than the amount of Mullenhoff & Korber's own claim, and believed the bid was in good faith, they saw nothing in it for them unless they themselves or somebody else would bid the property up to over a $100,000, perhaps.

They vehemently assert that this action of Mullenhoff & Kor-

ber in agreeing to aid Argueso in shutting out second mortgagees upon the other properties, as well as shutting them out on the Ingenio plantation, and, in addition, paying him $13,250 in cash, was such a fraud upon them as that, in morals and in equity, as well as under the rule governing the marshaling of assets, Mullenhoff & Korber ought to be held liable to them for at least the amount of cash they paid Argueso, and with which he absconded from the island. We will later refer to some of Mr. Bertran's evidence on this subject.

On the other hand, counsel for Mullenhoff & Korber strenuously insist that the doctrine of the marshaling of assets is unknown to the civil law, and unknown in Porto Rico; and one of the counsel, Mr. Diaz, who did all the business, and made all the mortgages and agreements, and brought all the suits in question here, insists that, in so far as he himself and his clients are concerned, the whole transaction was done in the best of faith, and that his clients lost more than $30,000 of their original debt by Argueso's wrongdoing, besides the heavy losses they sustained by his carrying off the sugar and crops, etc., he had agreed to turn over to them; and that when he, Diaz, sent Argueso to all these other attaching and opposing creditors, including complainants, and insisted that Argueso should procure them all to dismiss all of their suits and other proceedings, and particularly because he saw the agreement signed by Bertran and all of the other complainants, dated September 16, 1903, he was led to believe and was convinced that all of the complainants accepted Argueso's personal promise instead of their mortgages, and that, still having some doubt about the matter, he made their attorney, José de Guzman Benitez, swear before a notary that he had full power to dismiss all of the proceedings in the insular district court, as he did do, and that he felt that Mul-

Bertran y Casañas v. Mullenhoff & Korber.

lenhoff & Korber had a perfect right to discount their claim to Argueso as they did, and to deed the property back to whomsoever he should name, not knowing his purpose in that behalf, which may have been legitimate, etc., and that he felt that Mullenhoff & Korber had a perfect right to pay Argueso the cash as they did immediately and in good faith, and that this was many months before the actual foreclosure, which was prosecuted under the belief that the road was free and clear for them to do so, and that the object in so doing was to clear up the titles.

It becomes necessary here for us to set out at some length the substance of Mr. Diaz's testimony. As before mentioned, he stated that he had been the attorney for the firm of Mullenhoff & Korber all through these proceedings, and that they acted entirely on his advice with reference to the whole matter, and that he took no steps towards making that so-called secret agreement, about which he contends there was no secrecy at all. That he first drew it, and, before it was signed, sent it out from San Juan by Argueso to be submitted to Bertran and the other complainants at Humacao, and that later Argueso brought it back without complainants having signed it, and that in fact they did not have to sign it; that it was not made for them; but, when Argueso came back, he, Argueso, procured his own attorney, Mr. Landron, and complainants' attorney, Mr. José de Guzman Benitez, to satisfy him, Diaz, that complainants were satisfied about the matter and that complainants would, as they in fact thereafter did, dismiss all of the proceedings they then had pending in the controversy so as to enable Mullenhoff & Korber to proceed with their foreclosure; but that, still having doubts, he, Diaz, made complainants' attorney swear before a notary that he had received instructions from his clients, the complainants, to dismiss all the proceedings re-

Bertran y Casañas v. Mullenhoff & Korber.

ferred to. The witness then goes on to state that Argueso **had** told him that the second mortgage given to complainants was in fact bogus, or words to that effect, and intimates that, for this reason, it probably was easy for Argueso to secure their dismissal of all proceedings about it. That, when he was thus sure that complainants knew all about the matter, he held a meeting at his own office, where Mr. Korber, of Mullenhoff & Korber, Mr. Argueso, and his attorney, Mr. Landron, and the witness, were present, and that he, the witness, then and there advised Mr. Korber to sign this so-called secret agreement for his firm, which he did. He further testified that after Argueso had secured the dismissal of all of these proceedings and Mullenhoff & Korber had paid him the money, the court proceedings with reference to Mullenhoff & Korber's mortgages were proceeded with, and the matter was fully advertised three different times; and that, when the first sale was announced (it appears that, for some reason, probably because there was more than one mortgage, there was more than one sale), Mr. Bertran, of the complainants, came to his office, and said to him: "I hope you will try to make Argueso pay me what he owes me," and that he answered him, "I have nothing to do with Argueso, sir. You can direct yourself to his attorney, Mr. Landron," etc. He further testified that he was present at Humacao when the first sale was actually made, but that, at the second sale, his partner, Mr. Texidor, was present. That when he went to Humacao at the time of the first sale, complainant Bertran saw him again, there, and spoke to him about the matters taking place between Mullenhoff & Korber and Argueso, and asked him how much his firm intended to bid on the property for Mullenhoff & Korber, and that he, witness, told him that that would depend on the bidders; but that his firm, Mullenhoff & Korber, would

in no event bid to exceed $75,000; and that to this Bertran replied: "That would leave nothing to Argueso." That he replied in substance, "Yes, it will leave a lot to Argueso, because he really owes Mullenhoff & Korber more than $100,000."

Mr. Diaz was severely cross-examined by counsel for the complainants, but his testimony did not vary in any material respect from the statement here made of it. The witness further testified that Argueso requested his firm for the money, which they paid him, as he said he needed it to pay some creditors. That he did not ask Argueso just what he was going to do with that $13,000, because he knew well that, in the foreclosure of the property, it would not cover the Mullenhoff & Korber debt by a good deal. He testified further that, when the Ingenio plantation was turned over to Mullenhoff & Korber under the agreement, it was to be turned over planted, and that the machinery was to be in good shape; and that, when they went out there to take possession, practically all of the movable property had been stolen, and no crops had been planted at all, and that, for that reason, they did not pay more the $71,000. He further stated that the reason why the full amount of the debt was not bid under the local law was because when he, the witness, consulted the judge, he was advised to proceed under a new law which the legislature had recently passed, which, unlike the old Porto Rican procedure, is practically similar to the sytem of foreclosures in vogue in the States, where the mortgagee can bid whatever he can get the property for, and that this was what he in fact did; and that they got it against all bidders, as everybody had a right to bid there for it; that he wanted it in this way because, after his clients had lost such a large amount of money with Argueso, and his affairs were so mixed up, he wanted to have no question about the title to the

Bertran y Casañas v. Mullenhoff & Korber.

property afterwards. That he felt when José de Guzman Beni-tez, a lawyer of good standing, and representing these complainants, dismissed their suits in the insular court, that they had in some manner agreed to take Argueso alone for their debt. He further testified that the amount actually bid for the property by his clients was in fact much too high. He also stated that the balance of mortgage which his clients purchased from Fritze, Lundt, & Company was a lien only on 970 odd cuerdas, while the mortgage direct to Mullenhoff & Korber included as a part of Ingenio a much larger quantity of land, as stated.

We might answer right here that it is our opinion that the law regarding the marshaling of securities or assets is in force in Porto Rico, and can be enforced in proceedings in this court, and probably also in proceedings in the insular courts as well. We find that, in the state of Louisiana, which is a civil-law state, this very question arose, and it was held there, in the case of Willey v. St. Charles Hotel Co. 52 La. Ann. 1592, 28 So. 182, that, "the doctrine of marshaling of assets rests upon equity and natural justice. There is no express law in Louisiana governing the same, but, because our courts are courts of equity as well as of law . . . it is recognized here as it is in every enlightened system of jurisprudence."

We might add that it is doubtful if the question of marshaling of securities, save incidentally, cuts any figure in the controversy before us. While we have not examined that phase of the question very fully, it seems to us that the marshaling of securities is usually invoked only when the prior mortgagee attempts to foreclose; and that it is usually done either before he makes the attempt, or in the same proceeding; and that complainants' right, if any, to recover here, must be based on

Bertran y Casañas v. Mullenhoff & Korber.

another ground,—that of the fraud in law practised by Mullenhoff & Korber, if it has been properly established.

During the nearly two years we have been on this bench, we have seen a great many mortgages filed as exhibits in the suits brought before us, and, in the majority of cases, when the mortgage was given for a considerable sum on many properties, the amount for which each property was to be responsible, and which the mortgagee would be required to release if such sum was paid, was specifically set out; and our understanding is that this is the local law; yet Mr. Justice White, of the Supreme Court of the United States, in Royal Ins. Co. v. Miller, 199 U. S. 364, 365, 50 L. ed. 231, 232, 26 Sup. Ct. Rep. 46,— a case that went up from this court in 1905,—held that mortgages under the Code Napoleon and Spanish law were indivisible, and that the mortgage creditor had an undoubted right to assert the entirety of his mortgage rights against any or all of the property affected by the mortgage; but he cautiously held later, in that same case, that that case did not require the court, and it therefore did not decide, whether, under the Spanish law, if there was a junior incumbrancer having some special right in or to the avails of insurance money, such junior incumbrancer would be entitled to compel the mortgage creditor to exhaust the other property covered by the mortgage before attempting to irrevocably impute or apply the proceeds of the insurance to the *pro tanto* extinction of the mortgage debt.

Apart from the pleadings and the exhibits in the case, the testimony of Mr. Juan Bertran, who, as stated, was the active party for the complainants, is all the evidence on that side of the cause before us. We find it necessary to quote at considerable length from his evidence also. He testified in substance to the balance due complainants from Argueso and wife on the

Bertran y Casañas v. Müllenhoff & Korber.

mortgage, as here stated; that he knew of the existence of Mullenhoff & Korber's mortgage when complainants took their said second mortgage; that he and his companions took part in Argueso's fight against the foreclosure of Mullenhoff & Korber's mortgages, and were making efforts to defeat that firm's entire claim, on the ground that they had no individuality under the local law as a firm, and therefore could not sue to foreclose the mortgages at all; and that he knew of a criminal charge brought by his side of the controversy against Mr. Korber, but that it was not signed by him.

That Mr. Argueso came to complainants about the month of June, 1903, and asked them to agree to discontinue the proceedings they had against Mullenhoff & Korber for the annulment of the latter's mortgages so as to enable Argueso to make a settlement with them, which he was then trying to bring about; but that, notwithstanding this, he, Bertran, and the rest of the complainants, did not release their mortgages. That in the letter which they gave their lawyer they so stated, etc. When asked if, at the time he and the other complainants executed the agreement to Argueso to dismiss their proceedings, Argueso told them who was proposing to buy the Ingenio plantation, he said that Argueso stated that a certain party was going to buy it,—some third party,—but that nothing came of the efforts at that time. When asked to state the circumstances under which the note of June 25, 1904, was added to that memorandum, he stated: "The circumstances were that Mr. Argueso said to us that he had arrived at an agreement with Mullenhoff & Korber for the friendly settlement of all his suits, and that, in the act of settling definitely, our credits would be paid as second mortgagees; but that for this it was necessary that all of us should desist from further actions instituted, in order that

that settlement could be made." When asked what other rep-
resentations Argueso made to induce complainants to make that
agreement to dismiss, he answered: "That he (Argueso) had
agreed with Mullenhoff & Korber that, after dismissing our
actions, we would be paid the amount of our mortgages; and,
owing to that circumstance, that agreement was signed and we
signed the letter to the attorney." The question was asked di-
rectly of him, "Now, were you brought into any connection
whatever in the negotiations between Argueso and Mullenhoff
& Korber," and he answered, "In no way." When asked why
the complainants did not intervene in the proceedings at all,
he said: "Because, by virtue of this agreement that we had with
Argueso, we understood that the question of the sale of the prop-
erties was only a settled question that would not affect our in-
terest as second mortgagees, because we would be paid our
mortgages by Messrs. Mullenhoff & Korber as soon as they were
in possession of the property by virtue of the sale." Then the
court took the witness in hand and asked him this question:
"Why did you think that, Mr. Bertran? When did Mullenhoff
& Korber promise to pay you, and how? That is, why did you
think they were to pay as soon as they got possession of the
property?" Answer: "Because Mr. Argueso so stated to me."
He further stated that, after the property was foreclosed, he
asked Rafael Fabian to go and see Mr. Korber for the com-
plainants, and claim the balance due on this mortgage, in
accordance with what had been agreed upon with Argueso; that
he got no satisfaction, and witness himself then went and was
present when Mr. Korber happened into Mr. Fabian's office to
sign some cane-grinding contract, and that the witness then
claimed the amount due on their mortgage from Korber, but
the latter stated that he had nothing to do with that; and that

Bertran y Casañas v. Mullenhoff & Korber.

witness then replied that complainants would have to apply to the courts for their rights, as they were entirely just.

On cross-examination he stated that all of his knowledge of the efforts of Argueso to settle with Mullenhoff & Korber were obtained from the former, and that he believed it, when he saw Mullenhoff & Korber go into possession of the property quite a while before the foreclosure, and that Argueso had told complainants he had arrived at an agreement, and that complainants' money would not be paid until the property was sold judicially and Mullenhoff & Korber were put in legal possession of it; that nobody made this promise to them except Argueso himself, but that the latter stated he had so agreed with Mr. Korber; that witness did not know that Argueso was going away when he did go. When asked why he did not take any steps to protect himself when he knew that a settlement was going on, so as to see how far his interests were in fact protected, he answered: "Because it was stated by virtue of that agreement that we should not make any opposition at all, and that as soon as Messrs. Mullenhoff & Korber got in possession of the properties, what amounts they had agreed to deliver to Mr. Argueso, of them Messrs. Mullenhoff & Korber would pay us our mortgage." The court then asked the witness why he did not see Mullenhoff & Korber personally before they went into possession of the property, with a view to seeing whether they knew of this promise of Argueso or not; and his answer was: "Because Mr. Argueso, in making this transaction, soon afterwards he went to the States. He said that he would return in the act of his sailing and take possession to go with us to Mullenhoff & Korber and pay us. He said to me that Messrs. Mullenhoff & Korber had knowledge of our private contract that is here, a copy of which had been delivered to them." He further stated

Bertran y Casañas v. Mullenhoff & Korber.

that Argueso did not come back and that the sale took place in his absence. When asked if, at any time before the fore-closure, he had any transactions directly with Mullenhoff & Korber, or if he was in any manner ever deceived by any of their acts or any promise in regard to the payment of his money, he answered: "I have already stated that with Mullenhoff & Korber no claim was established until through Mr. Rafael Fabian." When asked if he relied on Mr. Argueso's prom-ise or upon the fact that his mortgage would be paid by Mullen-hoff & Korber, he answered: "I understood that the mortgage would be paid by Mullenhoff & Korber." When asked why he did not then deal directly with them, he answered: "I have said before what existed in that particular. By virtue of this agree-ment that is here, we, the second mortgagees, did not believe that it could fail, being obstructed the sale of the property that Mr. Argueso had mortgaged to Mullenhoff & Korber, be-cause this would pay our mortgage."

When we first examined this case, and when we examined the pleadings in several of the other cases brought by the other creditors some time ago, we were inclined to be of the opinion that Mullenhoff & Korber and their attorney were guilty of at least gross legal wrong against the complainants here, as well as the other creditors; but after having examined the facts with considerable care, we do not think so. The property brought all the money it could be made to bring in the market; at least, that is to be gathered from all the evidence before us. It may have been, of course, that Argueso in some manner de-ceived those other creditors who had liens on the other property outside of Ingenio, and kept them from bidding; but there is no evidence of it, and even that could not have prevented the gener-al public, to whom plenty of notice had been given, from bid-

Bertran y Casañas v. Mullenhoff & Korber.

ding. If the property brought all it would bring, then the first mortgage would have taken it all anyway, even if there had been no fight over it; yet the owners of the first mortgage lost over $30,000 if we include the $13,000 they paid Argueso, and this without mentioning the property they deeded back to Fulladosa. If what they paid to Argueso was added to their bid of $71,000, it would still be $5,000 under their net mortgage claim, as that was $88,000 without interest or costs. In addition to this, they lost most of their claim under their chattel mortgage of $20,000, because, as the evidence shows, Argueso removed most of the sugar and other movable property before they had time to take possession of it. It is our opinion that Mr. Argueso was the guilty party all through this transaction. Mr. Bertran and the other complainants made a mistake, of course, when they trusted him. We are of opinion that, as matter of fact, they trusted to him personally. He deceived them as between themselves and their attorney, and deceived them as to Mullenhoff & Korber. He showed their attorney and Mullenhoff & Korber a copy of the agreement between himself and complainants that did not have the additional agreement on it, and he no doubt in some manner deceived complainants' attorney about the conditions that were to be attached to the dismissal of the suits. Complainants and Argueso were evidently very intimate, as complainants had all along been aiding him in his fight against Mullenhoff & Korber. But, above all and beyond all, complainants themselves were guilty of the grossest carelessness in not at any time communicating directly with Mullenhoff & Korber, or asking the question squarely at the times of the sales, whether or not they were to be protected. The fact that they did not do this leads us to believe that they did not care; that they were trusting Argueso to

III. PORTO RICO—26.

Bertran y Casañas v. Mullenhoff & Korber.

pay them when the transaction was ended, which he failed to do. They even saw him go away to the States and believed him when he said that he would return and be present when Mullenhoff & Korber took possession of the property.

Counsel for complainants, in his brief, urges that the fact of others being defrauded as to the properties other than Ingenio ought to be given weight here, as showing the bad faith of Mullenhoff & Korber; but the answer to that is that, if it should be held that way, then complainants themselves would be equally guilty of bad faith to those other creditors, and could not recover here, because he that asks equity must come into court with clean hands.

The strongest point made in the brief of counsel for complainants here is that, if this so-called secret agreement had been brought to the attention of the judge of the insular court at Humacao at the time of the foreclosure, he certainly would not have permitted the transaction to proceed without in some manner protecting complainants. Now let us see what position the judge would have been in, even if he had knowledge of this so-called secret agreement. He could, of course, have caused notice of the agreement to be given other creditors, or taken other proper steps to prevent injustice. The amount bid for the property, as stated, did not pay off Mullenhoff & Korber by nearly $20,000 when interest and costs are considered. Then what could the judge have done to protect those other creditors, save to give them the opportunity to bid enough more than the full face value of Mullenhoff & Korber's claim, plus their own claim, and there is no evidence here, unless by inference, that the property was worth any such money; and such a bid, if made by complainants, would have to cover the $88,000 or more

Bertran y Casañas v. Mullenhoff & Korber.

due Mullenhoff & Korber and their own $13,000 or more, or more than $100,000.

To say that the fact that Mullenhoff & Korber were defrauding other creditors than these complainants at the same time will not do, because we do not know, as that issue was collateral and no direct evidence was taken on that subject, what may have taken place between Mullenhoff & Korber and Argueso as to those other creditors. The provisions in the so-called secret agreement, that Mullenhoff & Korber should pay this cash to Argueso and deed this property back to him or to any person he might designate, of itself is no evidence of guilty knowledge on the part of Mullenhoff & Korber. All this would have enabled Argueso to pay his debt, including complainants, if he had been honest. Those other creditors, of course, when they found some of the property back in the hands of Fulladosa, which really belonged to Argueso, promptly attached it and asserted their claims against it the same as these complainants could have followed the cash paid Argueso if it was in any place where they could get at it, because it was Argueso's property. The question suggests itself, as Mullenhoff & Korber did not bid as much as their own debt, and no other person, although the property was three times duly advertised, bid any more, whether the property was in fact worth any more? Further, if, as matter of fact, they were in danger of losing their whole debt through some technicality as to their legal existence as a partnership, did they not in law have the right to make any bargain they saw fit with Argueso, privately or otherwise, and discount their claim to him as they saw fit? And did they not have the absolute legal right to make this bargain with Argueso without telling their enemies about it? Let us not forget that there was absolutely no contract relation between Mullenhoff & Korber, on the one hand,

and these complainants on the other. Mullenhoff & Korber had their mortgage on the premises in question before complainants ever acquired any right therein; and, when complainants did acquire a right, it was junior to their rights. The doctrine of *suppressio veri* only arises when there is a contract relation between the parties; and while it may appear on a casual glance at the situation, that Mullenhoff & Korber would have acted in better faith if they had kept the $13,000 until they had made inquiry to ascertain if complainants were secured in any other way, still it must not be forgotten that Bertran and the other complainants had been endeavoring to prevent Mullenhoff & Korber from collecting anything at all; or, in other words, were endeavoring to force them to lose their entire claim. This money was paid to Argueso in July, right at the time of the dismissal of the suits, in consideration of that dismissal. If Mullenhoff & Korber refused to pay this money to Argueso, the matter might not have been settled at all, and Mullenhoff & Korber might have lost their entire $83,000, besides most of the other $20,000, which latter it seems they actually did lose.

Under all the circumstances here we do not think that the equities that bring about the marshaling of assets and of securities are of the class found in this case. It would be a serious thing, under all the circumstances here, to hold that Mullenhoff & Korber, just because they discounted what was justly their due, and did not see fit to tell their enemies about it, should be made to pay this $13,000 twice. We cannot say on the evidence that they were guilty of any fraud in connection with the whole matter such as would, in equity, make them liable to pay complainants' second mortgage; and we therefore find

Bertran y Casañas v. Mullenhoff & Korber.

the equities, the facts, and the law entirely for the respondents Mullenhoff & Korber.

As to respondents Argueso and wife, we find the issues entirely against them, and that they are indebted to the complainants in proportions and amounts as charged in the complaint, with interest and all costs of this suit to be ratably added. As to the $1,850.50, before referred to, or whatever sum it may be, that remains in the registry of the court as a surplus remaining over after a sale under a decree of foreclosure in equity suit No. 309, and which is said to belong to Argueso and wife or one or the other of them, we find, on investigation, that there are several different petitioners therefor, and it will therefore for the present be permitted to remain in the registry, until the priorities in that behalf can be settled.

A decree will therefore be prepared to carry out the views herein expressed. The costs will be paid by complainants.